LITTLE FOREST MEDICAL CENTER OF AKRON, APPELLEE AND CROSS-APPELLANT, *v.* OHIO CIVIL RIGHTS COMMISSION, APPELLANT AND CROSS-APPELLEE.

[Cite as *Little Forest Medical Ctr. of Akron v. Ohio Civ. Rights Comm.* (1991), 61 Ohio St.3d 607.]

(No. 90–1052—Submitted May 14, 1991—Decided September 4, 1991.)

*Joondeph & Shaffer, David H. Shaffer* and *Michael J. Spetrino,* for appellee and cross-appellant.

*Lee I. Fisher,* Attorney General, and *Gregory J. Vincent,* for appellant and cross-appellee.

*Isaac, Brant, Ledman & Becker, David H. Meade* and *Barbara L. Kozar,* urging reversal for *amici curiae,* Ohio Chapter of the National Organization for Women, Committee Against Sexual Harassment, National Association of the Physically Handicapped, Courage, Inc., and the Ohio Employment Lawyers Association.

SWEENEY, J.

I

The present action was initiated pursuant to R.C. Chapter 4112. R.C. 4112.02(A) provides as follows:

"It shall be an unlawful discriminatory practice:

"(A) *For any employer, because of the* race, color, religion, *sex,* national origin, handicap, age, or ancestry *of any person,* to discharge without just cause, *to refuse to hire,* or otherwise to discriminate against *that person* with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." (Emphasis added.)

In *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202–203, 421 N.E.2d 128, 131, this court concluded that the evidentiary standards applicable to a determination regarding a violation of Title VII of the Civil Rights Act of 1964 were likewise operable with respect to ascertaining whether a violation of R.C. Chapter 4112 has occurred. In this regard the court observed:

" 'Reliable, probative, and substantial evidence' is not defined in the statute [*i.e.,* R.C. 4112.05(G), which establishes the evidentiary standards for finding an unlawful discriminatory practice under R.C. Chapter 4112]. In previous cases, however, we have determined that federal case law interpreting Title

VII of the Civil Rights Act of 1964, Section 2000(e) *et seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112. *Republic Steel v. Ohio Civil Rights Comm.* (1975), 44 Ohio St.2d 178 [339 N.E.2d 658]; *Weiner v. Cuyahoga Community College District* (1969), 19 Ohio St.2d 35 [48 O.O.2d 48, 249 N.E.2d 907]. Cf. *Youngblood v. Dalzell* (1973), 6 EPD para. 8719 (S.D. Ohio, W.D.). Thus, 'reliable, probative, and substantial evidence' in an employment discrimination case brought pursuant to R.C. Chapter 4112 means evidence sufficient to support a finding of discrimination under Title VII."

Thus, the requisite burdens of proof regarding particular evidentiary issues established by the federal courts are relevant in determining whether there exists reliable, probative and substantial evidence of discrimination in violation of R.C. Chapter 4112.

The evidentiary issues and the respective burdens of the parties vary according to the nature of the discriminatory conduct in question. The appropriate standard is therefore dependent upon the criteria utilized by the employer to arrive at its employment decision. Where facially discriminatory employment criteria are applied, such practices constitute "disparate treatment" of a person entitled to protection under the law. Where facially neutral criteria are applied and the application of the criteria results in discriminatory consequences to members of the protected class, such practices are said to produce a "disparate impact" upon the affected individuals.

While the ultimate determination in both species of cases inevitably concerns the existence or nonexistence of unlawful employment discrimination, the legal inquiry is markedly different in several important respects. At the outset, it must be emphasized that the plaintiff bears the burden of establishing the existence of discriminatory motive only in cases involving disparate treatment. See *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 245–246, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268, 285. In a disparate impact case, discriminatory motive is irrelevant. *Watson v. Fort Worth Bank & Trust* (1988), 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827. In the latter type of case, the plaintiff may prevail if she establishes that the employer has engaged in a specific practice which has excluded from employment members of a protected class. *Id.* at 994, 108 S.Ct. at 2788–2789, 101 L.Ed.2d at 845. This demonstration may be made through statistical evidence revealing a discrepancy between the composition of the workforce at issue and the composition of the pool of candidates for the specific employment in the relevant labor market. *Id.* at 997, 108 S.Ct. at 2791, 101 L.Ed.2d at 846.

Once the plaintiff has established a prima facie case of disparate impact, the employer has the burden of producing evidence of a "business justification"

for its "neutral" hiring criteria. *Wards Cove Packing Co., Inc. v. Atonio* (1989), 490 U.S. 642, 659, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733, 753. The burden of persuasion remains with the plaintiff to show that the challenged criteria fail to serve, in a significant way, the employer's legitimate employment goals. *Id.* at 659–660, 109 S.Ct. at 2126, 104 L.Ed.2d at 753–754. In describing the "business justification" standard, the court in *Wards Cove, supra,* remarked:

" * * * The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils * * *." *Id.* at 659, 109 S.Ct. at 2126, 104 L.Ed.2d at 752–753.

In contrast, where facially discriminatory hiring criteria are utilized by the employer, as in the present case, a different analysis is undertaken. Under such circumstances, the common-law "business justification" standard is inapplicable. See *Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.* (1991), 499 U.S. ——, 111 S.Ct. 1196, 113 L.Ed.2d 158. Instead, the only defense to facially discriminatory employment practices is that afforded under Section 703(e)(1) of the Civil Rights Act of 1964, as amended, Section 2000e–2(e), Title 42, U.S.Code. This section provides:

"(e) Notwithstanding any other provision of this subchapter, * * * *it shall not be an unlawful employment practice for an employer to hire and employ employees * * * on the basis of his* religion, *sex,* or national origin in those certain instances *where* religion, *sex,* or national origin *is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *."* (Emphasis added.)

At the outset, it must be recognized that this statutory provision, inasmuch as it constitutes an exception to the public policy embodied in the Act as a whole to eliminate discrimination, is to be construed narrowly by the courts. See *Dothard v. Rawlinson* (1977), 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786, 800; *Western Air Lines, Inc. v. Criswell* (1985), 472 U.S. 400, 412, 105 S.Ct. 2743, 2752–2753, 86 L.Ed.2d 321, 322 (construing a similar provision in the Age Discrimination in Employment Act of 1967, Section 621 *et seq.,* Title 29, U.S.Code). Moreover, it has been observed that the bona fide

occupational qualification ("BFOQ") exception is in the nature of an affirmative defense with respect to which the employer bears the burden of proof. 1 Sullivan, Zimmer & Richards, Employment Discrimination (1988) 105, Section 3.5.

The BFOQ defense to a facially discriminatory employment policy requires the employer to initially demonstrate that the hiring criteria utilized involve the "essence" of its business. *Dothard, supra,* 433 U.S. at 333, 97 S.Ct. at 2729, 53 L.Ed.2d at 800; *Western Air Lines, supra,* 472 U.S. at 413, 105 S.Ct. at 2751, 86 L.Ed.2d at 333; 1 Sullivan, Zimmer & Richards, Employment Discrimination, *supra,* at 111, Section 3.6.2. The "essence of the business" requirement is not satisfied merely because the facially discriminatory criteria further some peripheral function of the employer. In the context of gender discrimination, the Fifth Circuit Court of Appeals described the BFOQ defense as follows:

"We begin with the proposition that the use of the word 'necessary' in section 703(e) requires that we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." (Emphasis *sic.*) *Diaz v. Pan American World Airways, Inc.* (C.A.5, 1971), 442 F.2d 385, 388.

Moreover, the employer asserting a BFOQ defense must also demonstrate that it had a factual basis for believing that all or substantially all members of the excluded gender would be unable to perform safely and efficiently the duties of the job involved, *Johnson Controls, supra,* 499 U.S. at —— – ——, 111 S.Ct. at 1207–1208, 113 L.Ed.2d at 178–179, or that it is impossible or highly impractical to differentiate the qualified from the unqualified in a nondiscriminatory manner. *Weeks v. Southern Bell Tel. & Tel. Co.* (C.A.5, 1969), 408 F.2d 228, 235; 1 Sullivan, Zimmer & Richards, Employment Discrimination, *supra,* at 119; Rossein, Employment Discrimination: Law and Litigation (1990) 2–31, Section 2.2(11).

It is the contention of appellee that it may utilize the less demanding "business justification" standard announced in *Wards Cove v. Atonio, supra.*[1]

---

1. It is certainly not surprising that appellee would seek the application of standards embodied in the business justification standard. That standard merely requires that the employer produce evidence that the challenged employment practice "serves, in a significant way, the legitimate employment goals of the employer. * * *" *Wards Cove, supra,* 490 U.S. at 659, 109 S.Ct. at 2125–2126, 104 L.Ed.2d at 753. As noted in *Wards Cove,* " * * * there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business * * *." *Id.* at 659, 109 S.Ct. at 2126, 104 L.Ed.2d at 753. In contrast, the BFOQ defense requires that a discriminatory practice concern the "essence" of the business. *Dothard, supra.* Moreover,

However, as seen in *Johnson Controls, supra,* this test is unavailable where the employer applies facially discriminatory hiring criteria. See, also, Rossein, *supra,* at 2–30.[2] Instead, the more stringent requirements of the BFOQ defense obtain. We therefore conclude that where, in an action brought pursuant to R.C. Chapter 4112 challenging alleged facially discriminatory employment practices, the employer seeks to justify gender-specific hiring criteria on the basis that such criteria constitute a bona fide occupational qualification, the burden is upon the employer to prove (1) that the gender-based criteria involve the essence of the employer's business, and (2) either that (a) all or substantially all members of the gender excluded by the employer are incapable of performing the job safely and efficiently, or (b) it is impossible or impractical to make determinations of each applicant's qualifications in a nondiscriminatory manner.

Applying the foregoing standard to the case at bar, it is apparent that appellee has failed to establish the affirmative defense of a bona fide occupational qualification. Inasmuch as appellee concedes that its gender-based criteria are not predicated upon a valid factual determination that males are incapable of performing the employment responsibilities of a nurse's aide, it bears the burden of establishing that (1) the privacy interests of its patients constitute a proper factual basis for restricting employment of nurse's aides to females[3] and (2) such privacy interests could not be furthered in a

---

under the "business justification" standard, the plaintiff is required to establish alternative nondiscriminatory methods of accomplishing the legitimate business goals of the employer. *Wards Cove, supra,* 490 U.S. at 660, 109 S.Ct. at 2126, 104 L.Ed.2d at 753. Under the BFOQ defense, the employer is required to demonstrate the unavailability of alternate nondiscriminatory means of selecting individuals capable of performing functions essential to the business. *Weeks, supra.*

2. The discussion herein of the *Wards Cove* business justification standard is limited to our consideration of its elements, our observations concerning how these elements differ from the more stringent requirements of the BFOQ defense and our further determination that the *Wards Cove* standard is inapplicable to actions predicated upon "disparate treatment." This opinion should not be interpreted as endorsing the application of the *Wards Cove* analysis to actions arising under R.C. Chapter 4112 predicated upon "disparate impact."

3. This privacy interest must rest on grounds more substantial than merely the individual preferences of business clients. In this regard, the court in *Diaz, supra,* observed:
"* * * While we recognize that the public's expectation of finding one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome. Thus, we feel that customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers." *Id.* at 389.
This is not to say that the privacy interests of patients could not be so interwined with the business goals of an enterprise that the burden of proving the BFOQ affirmative defense could

nondiscriminatory manner. Appellee has satisfied neither aspect of the test. While it may be conceded for the sake of argument that *some* female residents may object to the performance of intimate personal services by male nurse's aides, this would be equally true of the performance of such services by female nurse's aides for *some* of the *male* residents at appellee's facility.

Appellee has therefore failed to establish a factual basis for its initial contention that the privacy interests of its patients are currently being served. If, in fact, the privacy interests of its patients are paramount, how does appellee explain its failure to take these interests into account with respect to the treatment of the male residents of its facility? The BFOQ defense demands more than the mere assumption that the avowed justification for appellee's discriminatory practice (*i.e.*, the privacy interests of the patients) is legitimate when its male residents have no option to choose nursing care by a member of their own gender. We are unwilling to assume that all or some of the male residents, if asked, would nevertheless opt for treatment by female nurse's aides. Certainly appellee has adduced no evidence to support this conclusion.

Moreover, even if we were to indulge in the assumption that the privacy interests of its patients constitute a legitimate goal and that this goal is currently served, appellee has failed to demonstrate that the goal could not be furthered in a nondiscriminatory fashion (*i.e.*, assigning male nurse's aides to

---

not be satisfied. See *Fesel v. Masonic Home of Delaware, Inc.* (D.Del.1978), 447 F.Supp. 1346. However, *Fesel* is factually distinguishable from the case at bar. *Fesel* involved a nursing care facility serving thirty residents of which twenty-two were female and eight were male. In contrast, the facility operated by appellee is structured to accommodate two hundred fifty-six patients. The nursing home in *Fesel* employed six or eight nurse's aides while appellee employs sixty-seven. The sheer size of the facility operated by appellee must be assumed to afford greater flexibility in work assignments. Inasmuch as appellee bears the burden of establishing the impracticability of adjusting work assignments to eliminate the necessity for its discriminatory practice, such burden will necessarily be more difficult where the facility offers greater options for accomplishing its business goals. *Fesel* is also distinguishable from the case at bar in its treatment of the alleged preferences of the male residents of the Masonic Home. In footnote five of the opinion, the federal district court remarked:

"The question of the preferences of the male guests at the Home was not explored at trial. However, since the male guests do presently accept care from female nurse's aides, there does not appear to be any problem of nonconsenting male guests." *Id.* at 1353.

We are unwilling to engage in any such assumption in the case *sub judice.* To do so would be inconsistent with the requirement which underlies the BFOQ defense that the defendant bear the burden of establishing every element thereof. The BFOQ defense requires the employer to demonstrate that the justification for its discriminatory practice is, in fact, legitimate. Absent evidence that the privacy interests of male residents have been accommodated by the present practice of having their personal needs met by female aides, the burden of proof on the issue has not been satisfied.

male residents and non-objecting female residents and female nurse's aides to female and non-objecting male residents).

In reversing the Ohio Civil Rights Commission and the common pleas court, the appellate court applied the *Wards Cove* "business justification" standard. As mentioned previously, this test applies only to gender-neutral policies which produce a disparate impact upon a particular gender. In the present case, the more stringent BFOQ statutory defense is applicable to appellee's gender-based classification. Inasmuch as appellee does not dispute that male nurse's aides are *capable* of performing the responsibilities entailed in such employment, it must establish that the hiring of male nurse's aides not only would undermine the essence of the job involved but that it could not further these goals in a nondiscriminatory manner. The court of appeals, therefore, applied the wrong standard on review and must be reversed on this basis.

## II

The court of appeals also concluded that the offer by appellee to complainant of employment as a maintenance man tolled the accrual of back pay because such employment was "substantially equivalent" to the position he was denied, citing *Ford Motor Co. v. Equal Emp. Opportunity Comm.* (1982), 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721, 732–733. The appellate court based its judgment not only on the view that the maintenance job was substantially equivalent, but also that the pay for that job was higher than for a nurse's aide. This analysis is erroneous. The appellate court cited no evidence or reasoning in support of its finding of substantially similar employment. The goal of the complainant was to pursue a career in the health care field. While certainly there are aspects of employment as a nurse's aide which may appear unpleasant, the job is relevant to *career development* in the health care industry. The same cannot be said of employment as a janitor. An extra $.70 per hour does not alter this fact. Accordingly, the holding of the court of appeals that the two positions constituted substantially similar employment must be reversed.

## III

Appellee filed a cross-appeal challenging the denial of its motion for summary judgment and the subsequent affirmance thereof by the common pleas court and court of appeals. It is the contention of appellee that the denial of the motion was erroneous because it had established therein that the gender-based classification was justified and that no nondiscriminatory method of accomplishing its business objectives was possible. Appellant did not file any memorandum contra which included supporting affidavits.

Civ. R. 56(C) governs this issue. It provides:

"Motion and proceedings thereon. * * * *Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * * " (Emphasis added.)

Despite the absence of evidentiary materials adverse to the motion for summary judgment, it is beyond question that appellee was not entitled to judgment as a matter of law. Inasmuch as the *law* requires appellee to demonstrate that its gender-based classification involves the essence of the business and that this goal cannot be accomplished in a nondiscriminatory manner, it must appear from the motion that appellee had established both of these factors.

Appellee claims that the business interest served by its gender-based classification is the privacy rights of its patients. However, the undisputed facts indicate that there are approximately sixty male patients whose privacy rights have apparently not been considered by appellee as demonstrated by appellee's exclusive employment of female nurse's aides. There is nothing in the record to indicate that *all* of these residents, if given the choice, would opt for female aides. Given the state of the record when the motion was made, it was unnecessary to determine whether such goal could be furthered in a nondiscriminatory fashion since it had not been demonstrated that it had been "furthered" by appellee's discriminatory method. There was thus no factual basis for this alleged business interest.

We therefore affirm the decisions of the court below affirming the denial of appellee's motion for summary judgment.

## IV

Appellee further contends on cross-appeal that the hearing examiner committed reversible error by refusing to compel discovery when appellee's interrogatories were not answered and by failing to grant its motion *in limine* to exclude the testimony of the expert witness whose identity was the subject to which the interrogatories were directed. This argument is without

merit. As an initial matter, the hearing examiner concluded that the information sought through the interrogatories had been provided by the opposing party. Appellee has failed to demonstrate that this determination was without foundation. Second, rulings on such motions are matters committed to the sound discretion of the administrative tribunal. They will not be reversed absent an abuse of discretion. There was no abuse of discretion present.

The judgment of the court of appeals is therefore affirmed in part, reversed in part, and the cause is remanded to the trial court for reinstatement of judgment.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

DOUGLAS, H. BROWN and RESNICK, JJ., concur.

MOYER, C.J., HOLMES and WRIGHT, JJ., dissent.

HOLMES, J., dissenting. The proper application of employment discrimination law as enumerated by the federal courts in Title VII actions, where an employer defends by raising the privacy interests of its customers as the basis for a bona fide occupational qualification ("BFOQ") defense, should reasonably result in the affirmance of the judgment of the court of appeals here.

The particularized facts of this matter are that Little Forest Medical Center operates a skilled nursing facility providing health care services to some two hundred fifty-six elderly patients, eighty percent of whom are female. The majority of the patients require "total care," meaning that these patients require assistance with all activities of daily living, including bathing and dressing. At the time of hearing, only twelve patients were ambulatory and only four patients were able to bathe themselves. In addition, a very high number of the patients were incontinent. Aides provide constant personal service to the patients, which includes bathing the patients, assisting in the patients' use of bedpans, providing bowel and bladder training for patients, and giving enemas. An attending physician at Little Forest testified that the female patients would refuse to accept care from a male aide. Based upon these facts Little Forest reasonably concluded that gender (female) was a BFOQ for employment at Little Forest as a nurse's aide for the protection of the privacy of its patients.

Congress has specifically provided for the BFOQ as a defense to actions brought for employment discrimination pursuant to the Civil Rights Act of 1964, as amended. Under Section 703(e)(1) of the Act, Section 2000e–2(e), Title 42, U.S.Code, " * * * it shall not be an unlawful employment practice for an employer to hire and employ employees * * * on the basis of his * * * sex

* * * in those certain instances where * * * sex * * * is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *." The United States Supreme Court, in reference to this statutory defense, stated, " * * * [t]he existence of the BFOQ exception shows Congress' unwillingness to require employers to change the very nature of their operations in response to * * * [Title VII]." *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268, 283.

Certainly, there should be no argument that the BFOQ defense may be based upon the employer's concern for the privacy rights of its patients. This conclusion certainly would be entirely consistent with the Ohio statute known as the "Patient Bill of Rights" which mandates that nursing homes protect the privacy of their residents. R.C. 3721.13(A)(11).

Within its brief, Little Forest relies upon the BFOQ defense, not the "business justification" standard as stated by the majority. Further, the appellee recognizes in its argument here that the BFOQ is an affirmative defense and that, as the employer, Little Forest has the burden of proving that the essence of its business operation would be undermined unless it could hire members of one sex exclusively. See *Dothard v. Rawlinson* (1977), 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786.

The appellee presented all the appropriate evidence before the Ohio Civil Rights Commission to properly support its BFOQ defense that its policy of hiring only female nurse's aides was to protect its patients' privacy rights. The commission's findings of fact and conclusions of law so stated:

" * * * Respondent [Little Forest] proved there was a factual basis for its belief that some female patients would object to being viewed in the nude or having their genitals touched by males. The testimony of the physician who treated many of Respondent's female patients and the nurses who cared for them supported this conclusion. The Commission did not present any evidence to the contrary."

Here, Little Forest appears to be aware that its hiring practice limiting aide employees to females is "overt discrimination" as described in *Dothard, supra,* at 332, 97 S.Ct. at 2728, 53 L.Ed.2d at 799, and also recognizes that it must bear the burden of establishing that its otherwise unlawful classification falls within the BFOQ exception.

Where privacy invasions of guests are the basis of the BFOQ defense, rather than the physical ability of one sex to perform required job responsibilities, there are different considerations of proof needed by the employer. Accordingly, in *Fesel v. Masonic Home of Delaware, Inc.* (D.Del.1978), 447 F.Supp. 1346, it was stated:

" * * * [W]hen an employer defends a sex discrimination action by raising the privacy interests of its customers as the basis for a bfoq defense, that employer must prove not only that it had a factual basis for believing that the hiring of any members of one sex would directly undermine the essence of the job involved or the employer's business, but also that it could not assign job responsibilities selectively in such a way that there would be minimal clash between the privacy interests of the customers and the non-discrimination principle of Title VII." *Id.* at 1351.

In *Harden v. Dayton Human Rehabilitation Ctr.* (S.D.Ohio 1981), 520 F.Supp. 769, affirmed (C.A.6, 1985), 779 F.2d 50, the court held that the employer had not sustained its affirmative defense of BFOQ because it had failed to establish either that the hiring of women guards would undermine the essence of the employer's operations, or that job responsibilities could not be assigned in order to minimize the anticipated conflicts.

Here, the privacy concerns of the employer relative to its elderly guests should be given a significantly higher degree of attention and consideration by the Civil Rights Commission, as well as by the reviewing courts, than would be given the privacy concerns of management for inmates in a prison facility. As to these privacy concerns, Little Forest presented evidence of the intimate care and attention that was needed by a majority of its female patients, and that they would be unwilling to accept the care from a male aide.

In support of its position that job responsibilities could not reasonably be reassigned in order to minimize conflicts, Little Forest adduced evidence that it could not reasonably accommodate a male aide without upsetting its whole staff routine, and without incurring additional business costs. Evidence was offered to show that it could not rearrange its assignment of aides without creating an additional, and unnecessary, position. The administrator of Little Forest testified that there are male and female residents on each floor of the facility, that an aide is assigned to a section or block of rooms on each floor, and that each aide provides intimate personal care for the patients in the assigned section.

It was also demonstrated that the registered nurses and the licensed practical nurses are assigned to a block of rooms in the same manner as the aides. This system of assignment is intended to make the most efficient use of the employees' time. If an aide does not report to work as scheduled, then the group of rooms assigned to the remaining aides is adjusted according to a pre-designed schedule and each aide knows the rooms to which she is assigned.

The administrator at Little Forest also testified that if a male aide were hired to provide personal care for the female residents who did not object and

for the limited number of male residents, then the male aide would be an extra employee and such an employee would be surplusage. It certainly cannot be the intent of this federal Act to require employers to incur additional needless expense to accommodate a male aide, nor can I believe it to be the meaning of this law to require employers to deliberately mismanage their operations. See *Norwood v. Dale Maintenance System, Inc.* (N.D.Ill.1984), 590 F.Supp. 1410.

Based upon all the aforestated evidence submitted by Little Forest, it sustained its burden of supporting its BFOQ defense based upon the privacy interests of its patients.

The commission offered the testimony of one Dr. May Wykle, a professor of psychiatric and gerontological nursing, who had never visited Little Forest and was not personally familiar with the physical layout of Little Forest. She testified that in her opinion any nursing facility such as Little Forest could assign a male nurse's aide to serve only male patients without diminishing the quality of patient care, or could assign the male aide selectively to those female patients who did not object to such assignment.

The court of appeals ruled in favor of Little Forest upon the basis, *inter alia*, that the commission's decision was not supported by reliable, probative and substantial evidence. I agree with the court of appeals.

Little Forest sets forth in its cross-appeal that the court of appeals should have sustained the assignments of error claiming procedural errors committed by the commission hearing officer concerning the testimony of the commission's expert witness. I am in agreement with the cross-appellant in this regard. The hearing officer of the commission abused his discretion in not granting Little Forest's motions relating to discovery. The history of the case in this regard is as follows. After the testimony and evidence of Little Forest were presented to the hearing officer, counsel for the commission requested a postponement in order to secure an expert witness to rebut the employer's case. The hearing officer granted a sixty-day postponement over Little Forest's objections.

Shortly thereafter, Little Forest served the commission's counsel with interrogatories which sought the identity of the expert witness to be used by the commission and the subject matter of the testimony to be offered. The commission did not answer the interrogatories. On December 2, 1987, Little Forest moved for an order compelling answers to interrogatories. The commission ignored the motion but its counsel informally advised counsel for appellee, in a telephone conference, that the commission intended to call a person identified as Dr. May Louise Wykle as its rebuttal witness. Counsel for the commission did not, however, state the subject matter of the witness's anticipated testimony.

On December 23, 1987, Little Forest filed a motion *in limine* to prevent Dr. Wykle from testifying as a sanction against the commission for its refusal to answer interrogatories. The commission did not respond to the motion *in limine*. The hearing officer overruled the motion *in limine* and the motion to compel on January 7, 1988. When these efforts to obtain discovery regarding the commission's rebuttal witness failed, counsel for Little Forest subpoenaed Dr. Wykle for a deposition. The commission moved to quash the subpoena the same day that it was served. The following day, January 12, 1988, the hearing officer granted the commission's motion to quash before counsel for Little Forest had an opportunity to respond. Little Forest then moved for a postponement of the hearing to permit its counsel to depose the witness but that motion was denied.

Thereafter, the expert witness (Dr. Wykle) testified over objection, the record was closed, briefs were filed, and the hearing officer issued a report recommending a finding against Little Forest. Little Forest filed objections to the report. These objections were overruled by the commission and the recommended order was adopted verbatim.

The actions of the hearing officer in denying all of Little Forest's discovery motions were unreasonable and an abuse of discretion. Accordingly, the testimony of the commission's expert witness should not have been considered by the commission. The court of appeals should have sustained this assignment of error of Little Forest.

Additionally, I would affirm the judgment of the court of appeals relative to the tolling of the employer's liability for back pay when comparable work had been offered the complainant. On May 4, 1987, Little Forest offered Rayferd Lawson full-time employment in the maintenance department at the nursing home. If Lawson had accepted the offer, his wage rate would have been $.70 an hour more than is paid to an aide. In all other respects, it appears that the terms and conditions of his employment would have been identical to that of an aide. This offer of employment was refused by Lawson.

The court of appeals correctly ruled that Lawson's claim for back pay was tolled because he refused an unconditional offer of substantially equivalent employment. *Ford Motor Co. v. Equal Emp. Opportunity Comm.* (1982), 458 U.S. 219, 232, 102 S.Ct. 3057, 3065–3066, 73 L.Ed.2d 721, 732–733. The court of appeals agreed with Little Forest, and with the other courts which have ruled on this issue, that the position offered need not be identical but that it only needs to be "substantially equivalent." *Equal Emp. Opportunity Comm. v. Exxon Shipping Co.* (C.A.5, 1984), 745 F.2d 967, 977; *Rasimas v. Michigan Dept. of Mental Health* (C.A.6, 1983), 714 F.2d 614, certiorari denied (1984), 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537. Contrary to the

argument made by appellant, the court of appeals did not reweigh the evidence but simply ruled that the commission erred, as a matter of law, when it applied the wrong legal standard in evaluating the employer's unconditional offer of employment.

In the instant case, the position of employment offered to Lawson was substantially equivalent to the position of aide because the hours, working conditions, responsibilities and pay were similar. In certain respects, both positions required a measure of the same type of work because maintenance employees and aides both perform quasi-janitorial duties. If there is any doubt about the sufficiency of the offer of employment, that question is answered in Lawson's own hand when he completed an application for employment and stated that one of the types of employment which he sought was "electrical maintenance." Here, he was given work in the only type of "maintenance" done at the home.

Based upon all the foregoing, I would affirm the judgment of the court of appeals.

MOYER, C.J., and WRIGHT, J., concur in the foregoing dissenting opinion.

WRIGHT, J., dissenting. I would affirm the well-reasoned decision of the court of appeals. Results such as this one offend the average citizen's sensible recognition of what is right and what makes common sense. I suggest that if one of us (including the author) mandated that one of his or her older female relatives be manhandled by a male nurse, a spirited effort would be made to consign that judge to the nether regions.

The curious thing about the majority opinion is that the syllabus law is in large measure sound.[4] However, the majority completely misses the mark in applying the ruling case law to the record before us. Having conceded that we should be guided by federal law, the majority cites the BFOQ exception to gender discrimination provided by Section 703(e)(1) of the Civil Rights Act of 1964:

"(e) Notwithstanding any other provision of this subchapter, * * * it shall *not* be an unlawful employment practice for an employer to hire and employ employees * * * on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a *bona fide occupational qualification reasonably necessary to the normal operation*

---

4. The weakness in the syllabus is that it never mentions the federal law upon which this case is decided, specifically the bona fide occupational qualification ("BFOQ") defense to a Title VII action. Section 2000e–2(e), Title 42, U.S.Code.

*of that particular business or enterprise * * *.*" (Emphasis added.) Section 2000e–2(e), Title 42, U.S.Code.

Having mouthed a test which was met by an *uncontested* motion for summary judgment,[5] the majority cites *Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.* (1991), 499 U.S. ——, 111 S.Ct. 1196, 113 L.Ed.2d 158, which has exactly nothing to do with male nurses touching the "personal parts" of elderly female patients.

The applicability of the BFOQ should be clear enough to even one untrained in the law. The court of appeals held that the record demonstrates the patients at Little Forest require female attendants. I agree. In my view the BFOQ was established. Since all this is lost on the majority, I dissent.[6]

---

**5.** We recently approved and adopted *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, in *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, wherein, at paragraph three of the syllabus, we held: "A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." While neither the commission nor the courts below had the benefit of that important statement of the law, the court of appeals' opinion should be affirmed on this basis alone.

Little Forest bore the burden of establishing the BFOQ defense at trial. In its motion for summary judgment, Little Forest provided affidavits establishing the BFOQ defense, thereby shifting the burden of production. In response to this motion the commission produced no evidence. Consequently, Little Forest was entitled to judgment as a matter of law.

**6.** I cannot neglect to comment on the hearing examiner's failure to grant the hospital's motion *in limine* after appellant's complete disregard for the Ohio Rules of Civil Procedure. The majority simply passes this issue off by indicating the hearing examiner "concluded that the information * * * had been provided by the opposing party." We should limit ourselves to the record, which is devoid of any evidence to support such a conclusion—no testimony, no affidavits and not even a professional statement by appellant's counsel. This was clear-cut error, albeit harmless given a proper disposition of the case, *not* an exercise of "discretion" on the part of the trier of fact.